# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**SHERYL TAYLOR,**

                **Case No.: 5:18-cv-00071-JSM-PRL**

               **Plaintiff,**

   **v.**

**OOMA, INC.,**

               **Defendant.**

_____/

## MOTION TO DISMISS, OR IN THE ALTERNATIVE TO STAY, AND TO COMPEL ARBITRATION AND MOTION FOR SANCTIONS AND RELATED MEMORANDA OF LAW

Plaintiff Sheryl Taylor filed what, on the surface, appeared to be a run of the mill lawsuit alleging that Defendant Ooma, Inc. ("Ooma") used an automatic telephone dialing system to call her cellular telephone without consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. But this case is not what it appears to be, as Plaintiff and her counsel have misrepresented the facts and circumstances giving rise to this lawsuit, which has caused Ooma needlessly to have to expend time and resources uncovering the truth.

The truth is that Sheryl Taylor is actually Sheryl *Holly-*Taylor, who, along with her husband, Chris Holly, runs a business that subscribed to Ooma's services, and not only stopped paying for those services, but sent Ooma profanity-laced emails in response to Ooma's billing inquiries. The truth is that the 681-XXX-0385 phone number identified in the Complaint is actually *618*-XXX-0385—a number that Plaintiff's business provided to Ooma when it subscribed to Ooma's services. The truth is that when the business activated Ooma's service, it consented to receiving automated and other calls on the number provided, although Ooma did not actually use an autodialer when it called that number to inquire about Plaintiff's bill. The truth is that, to the

extent Plaintiff had a complaint about Ooma, Plaintiff should have pursued arbitration, pursuant to the agreement entered into when the business subscribed to Ooma's services.

But Plaintiff has not been truthful.  And her behavior, and that of her counsel, warrants the imposition of sanctions under, *first*, 28 U.S.C. § 1927, and *second*, the Court's inherent authority to control the integrity of the judicial process and the conduct of the parties before it.  Moreover, under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, the Court should compel arbitration of Plaintiff's claims pursuant to the parties' agreement and dismiss the Complaint, or, alternatively, stay the case, pursuant to Fed. R. Civ. P. 12(b)(1) and 9 U.S.C. §§ 3–4.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties

#### 1.     Defendant Ooma

Ooma provides a voice over IP ("VoIP") telephone service that allows residential and business customers to place and receive calls through an Internet-based platform.  Jackson Decl. ¶ 4.[2]  Among other services, Ooma provides "Ooma Office," which utilizes the bandwidth in a customer's broadband Internet connection to replace the customer's need for a traditional telephone service.  *Id.* ¶¶ 5–6.  In short, the customer's standard telephone connects to Ooma's equipment, and the customer is able to place and receive telephone calls using a telephone number that Ooma supplies.  *Id.*

---

[1]  "Within this district, '[m]otions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).'"  *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1222 (M.D. Fla. 2013) (quoting *Bell v. Atl. Trucking Co., Inc.*, No. 3:09–cv–406–J–32MCR, 2009 WL 4730564, at *2 (M.D. Fla. Dec. 7, 2009), *aff'd*, 405 F. App'x. 370 (11th Cir. 2010)).

[2]  "[W]here a defendant raises a factual attack on subject matter jurisdiction, the district court may consider extrinsic evidence . . . ."  *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009).

Ooma Office customers activate the service through a five step Internet-based activation portal on Ooma's website.  *Id.* ¶ 7.  There, the customer provides its information, selects a phone number, provides Ooma with payment information, and agrees to Ooma's standard Terms and Conditions.  *Id.*; Ex. A.

> ## 2. Plaintiff Sheryl Taylor, aka Sheryl Holly, aka Sheryl K. Holly-Taylor, Wife of Chris Holly, and Sole Proprietor of Shadow's Pub

Plaintiff filed this lawsuit under the name "Sheryl Taylor."  Compl., ECF No. 1 at 1.  In her Complaint, Plaintiff alleges that Ooma used an automatic telephone dialing system to call her cellular telephone without consent, in violation of the TCPA.  *Id.* ¶ 17.  To support that claim, Plaintiff alleged that Ooma unlawfully called "681-XXX-0385," and that this number corresponds to Plaintiff's cellular telephone.  *Id.* ¶ 3.  This was surprising to Ooma, as it has no record of ever calling such a number.  Jackson Decl. ¶¶ 30–32.

To investigate the claims, Ooma's counsel reached out to Plaintiff's counsel to inquire as to Plaintiff's complete telephone number.  Kohlhofer Decl. ¶ 5.  Plaintiff's counsel confirmed that Plaintiff's cellular telephone number does not, in fact, have a "681" area code, but instead a "618" area code.[3]  *Id.* ¶¶ 6–8; Ex. G.

Ooma searched its databases again, this time, for *618*-XXX-0385.  Jackson Decl. ¶ 33.  There was one "hit":  618-XXX-0385 was associated with an Ooma Office account for a customer called "Shadow's Pub," located at 5501 West Highway 316 in Reddick, Florida.  *Id.* ¶¶ 14, 33.  The business's representative, Chris Holly, signed up for Ooma Office service and provided the aforementioned contact number.  *Id.* ¶¶ 13–14.

---

[3]  As of the filing of this motion, Plaintiff has not filed an Amended Complaint or other otherwise sought to correct the record.

It appears, however, that Chris Holly is married to the Plaintiff here, as described in a recent lawsuit filed by Shadow's Pub's commercial landlord.   There, the landlord demonstrates that he leased the facility at 5501 West Highway 316, Reddick, Florida to Sheryl Holly-Taylor, Exs. I at 1, J at 1, and that service of his lawsuit was effected by the Marion County Sheriff's Department on "Chris Holly, husband," Ex. K at 1.  *See also* Ex. L at 2 (footer in motion filed by the Hollys describing themselves as "Sheryl & Chris Holly").   Moreover, in July 2017, Florida renewed Retail Beverage License Number BEV5203443 to an individual named Sheryl Kathleen *Holly-Taylor*, doing business under the name "Shadows Pub," at 5501 West Highway 316, in Reddick, Florida. Ex. H at 1.  To be sure, as recently as May 7, 2018, several months after suing Ooma, Plaintiff signed her name:  "Sheryl Holly-Taylor."  Ex. L at 2 (signature block).

**B.      Plaintiff, dba Shadow's Pub, Entered into an Enforceable Agreement with Ooma in August 2017**

To activate Ooma Office, customers must use a five-step activation portal on Ooma's website (the "Activation Portal").   Jackson Decl. ¶ 7; *see also* Ex. A (screenshots of Activation Portal).  The Activation Portal collects information about the customer, including the business's name, address, contact information, and the name of its representative.  Jackson Decl. ¶ 7; Ex. A at 2–3.

Step Five of the activation process requires the customer to provide credit or debit card information for billing purposes and prompts the customer to check a box next to the affirmation: "I accept the Terms and Conditions."  Jackson Decl. ¶ 7; Ex. A at 5.[4]   Before Ooma's system will activate an account, the customer must accept the Terms and Conditions.  Jackson Decl.  ¶ 8.

---

[4] The words "Terms and Conditions" appear in bright blue font, and hyperlink to the full text of Ooma's standard Terms and Conditions—which are available on Ooma's publicly accessible website.  Jackson Decl. ¶¶ 8–9; Ex. A at 5.

When a customer account is created, Ooma's system generates an "Internal ID" code, which tracks the customer's activation details, including, *e.g.,* the date and time of the affirmation that the customer accepts Ooma's Terms and Conditions. *Id.* ¶ 10. These details are stored in a database on Ooma's systems. *Id*.

Ooma's database shows that Plaintiff activated an Ooma Office account on August 4, 2017. *Id.* ¶ 12; Exs. D, E. During activation, the customer was identified as "Shadow's Pub." Jackson Decl. ¶ 12. Further, Ooma's records reflect that the activation process was completed by "Shadow's Pub" representative "Chris Holly" who, among other things, provided the email address "shadows_pub@yahoo.com." *Id.* ¶ 13; Ex. E. When the account was activated, the system's database assigned Shadow's Pub the following Internal ID: "5vvga4u3np39r6hxgcu478q64hnxxbuv." Jackson Decl. ¶ 17; Exs. D, E. The database shows that on August 4, 2017, at 8:17 p.m., the Internal ID associated with Shadow's Pub agreed to Ooma's standard Terms and Conditions. Jackson Decl. ¶¶ 17–18; Exs. D, E.

### C.   The Agreement Requires all Claims and Disputes to be Arbitrated

Ooma's Terms and Conditions (the "Agreement") "constitute an agreement . . . between Ooma, Inc. . . . and each of [its] customers[.]" Ex. B at 1.[5] After instructing the customer to "READ TH[E] AGREEMENT CAREFULLY BEFORE INSTALLING OR USING OOMA SERVICES," the Agreement highlights an important representation that the customer is making:

> YOU REPRESENT TO US THAT *YOU HAVE THE AUTHORITY TO ENTER THIS AGREEMENT* AND THAT YOU HAVE READ AND FULLY UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT. YOU AND OOMA AGREE THAT CHECKING THE 'I ACCEPT' BUTTON REPRESENTS YOUR ELECTRONIC SIGNATURE TO THIS AGREEMENT, AND YOU INTEND SUCH ACTION BY YOU TO

---

[5] Ooma last updated its standard Terms and Conditions in April 2016. The Declaration of Spencer Jackson, Ooma's Vice President and General Counsel, confirms that the version provided to this Court, Ex. B, is the same version that Ooma provided to Plaintiff when her account was activated. Jackson Decl. ¶ 19; *see also* Ex. B at 1.

AUTHENTICATE THIS DOCUMENT AND TO HAVE THE SAME FORCE
AND EFFECT AS A MANUAL SIGNATURE.

Ex. B at 1 (emphasis added).

The Agreement contains the following mandatory arbitration provision:

[W]e each agree to resolve any claim, dispute, or controversy . . . arising out of or
in connection with or relating to [the Agreement], or the breach or alleged breach
thereof . . ., by binding arbitration by the Judicial Arbitration and Mediation
Services . . . .

*Id.* at 29 ¶ 16.  The Agreement provides that "[t]he arbitration will be conducted in Santa Clara

County, California." *Id.*

In addition to the arbitration provision, the Agreement includes a provision to ensure that

Ooma is able to bill the customer for services rendered:  "[i]n order to . . . activate Services from

us, you are required to provide . . . a credit or debit card number [and if] your credit or debit card

expires [or] is cancelled . . . you must advise us at once and provide new credit or debit card

information . . . ." *Id.* at 21 ¶ 11(b); *see also id.* at 21 ¶ 11(c).  In addition, the customer must

represent and warrant that (i) "[its] contact information . . . and all other information related to [its]

Ooma account is correct and up-to-date at all times," *id.* at 3 ¶ 3(c); and (ii) "[it] will pay for all

charges for use of [its] Ooma Equipment and Services," *id.* at 3 ¶ 3(e).  *See also id.* at 21 ¶ 11(c)(i)

("**Collection**: If your Services are terminated, you will remain fully liable to us . . . and any and

all costs we incur to collect such amounts, including, without limitation, collection costs and

attorneys' fees.").

### D.   Plaintiff Failed to Keep a Working Credit Card on File at Ooma, Which Prompted Contacts from Ooma's Customer Service Team

Plaintiff's relationship with Ooma was short lived.  In November 2017, the credit card that

Plaintiff had provided upon activation in August stopped working.  Jackson Decl. ¶¶ 20–21.  In

violation of the Agreement, Shadow's Pub had not called to update this information.  *Id.* ¶ 21;

Ex. B at 21 ¶ 11(b)–(c).  Ooma attempted to contact representatives of Shadow's Pub, but was met with abusive language and blanket refusals to pay the amounts owed.  Jackson Decl. ¶¶ 22–24, 26; *see, e.g.*, Ex. F (abusive email).   As a result, the Shadow's Pub Ooma Office account was terminated on February 10, 2018.  Jackson Decl. ¶ 27.  Two days later, on February 12, 2018, Plaintiff initiated this vexatious litigation.  *Id.* ¶ 28; Compl. at 1.

## PLAINTIFF'S CLAIMS MUST BE ARBITRATED PURSUANT TO THE FEDERAL ARBITRATION ACT

The Federal Arbitration Act provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2.  "[T]he FAA *requires* a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable under 'ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement."  *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (emphasis added) (citing 9 U.S.C. §§ 2–4).   "This inquiry must be undertaken against the background of a 'liberal federal policy favoring arbitration agreements.'"  *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

The Court must defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 589 (1960).  "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Ferrara v. Luxottica Retail N. Am. Inc.*, No. 8:17-CV-2914-T-33AEP, 2018 WL 573430, at *1 (M.D. Fla. Jan. 26, 2018) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25-26 (1983)).  Similarly, "Florida public policy favors arbitration and all

doubts as to the scope of an arbitration agreement should be resolved in favor of arbitration." *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1199 (Fla. Dist. Ct. App. 2012).

As set forth below, the parties have a valid and enforceable arbitration agreement, and Plaintiff's TCPA claim falls within its scope. Thus, Plaintiff must arbitrate the claim.

### A.      The Parties Formed an Enforceable Agreement Under Florida Law

To determine whether a valid and enforceable arbitration agreement exists, courts apply state-law contract principles, while "tak[ing] into consideration" "[t]he 'federal policy favoring arbitration.'" *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005). "A contract is made under Florida law when three elements are present: offer, acceptance, and consideration." *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200 (Fla. Dist. Ct. App. 2012).

*First*, Ooma's Terms and Conditions were accepted when Ooma Office (i.e., the service Ooma offered) was accepted. "'On the internet, [a] primary means of forming a contract [is the] so-called 'clickwrap' (or 'click-through') agreement[], in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use . . . .'" *Theodore D'Apuzzo, P.A. v. United States*, No. 16-62769-CIV, 2017 WL 4271641, at *4 (S.D. Fla. Sept. 25, 2017) (citation omitted). "In Florida and the federal circuits . . . clickwrap agreements are valid and enforceable contracts . . . [and] are examined by applying general contract principles." *Salco Distributors, LLC v. iCode, Inc.,* No. 8:05 CV 642 T 27TGW, 2006 WL 449156, at *2 (M.D. Fla. Feb. 22, 2006); *accord Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. Dist. Ct. App. 2017) ("'Clickwrap' agreements are generally enforceable.").[6]

---

[6] By contrast, "[a] 'browsewrap' agreement occurs when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process." *Vitacost.com, Inc*, 210

More broadly, courts applying Florida contract law have held that signing an agreement indicates assent to the agreement's offered terms. *Jones v. Sallie Mae, Inc.*, No. 3:13–cv–837–J–99MMH–MCR, 2013 WL 6283483, at *5 (M.D. Fla. Dec. 3, 2013). Indeed, "'[a] party who signs an instrument is presumed to know its contents [and] cannot avoid his obligations thereunder by alleging that he did not read the contract, or that the terms were not explained to him, or that he did not understand the provisions.'" *Id.* (quoting *Linville v. Ginn Real Estate Co.,* LLC, 697 F. Supp. 2d 1302, 1308–09 (M.D. Fla. 2010)). Further, Florida law provides that "an electronic signature . . . shall have the same force and effect as a written signature." Fla. Stat. § 668.004; *see also* 15 U.S.C. § 7001(a)(1); *accord Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367, 1369–70 (S.D. Fla. 2011) ("The Plaintiffs' admitted failure to read the [clickwrap agreement] does not excuse compliance with its terms"); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) ("Absent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding contract, will not excuse compliance with its terms.").

Here, the parties formed a valid agreement under Florida law. Ooma offered its VoIP telephone service to Plaintiff through its website. To accept its offer, Ooma required prospective customers, including Plaintiff, to complete a five-step activation process—which cannot be completed without two final customer actions: (i) clicking a box next to the phrase "I accept the Terms and Conditions"; and (ii) clicking a button labeled "Activate." Jackson Decl. ¶ 8; Ex. A at 5.

On August 4, 2017, Plaintiff accepted Ooma's offer by navigating through all five steps of the activation portal, agreeing to Ooma's Terms and Conditions, and clicking "Activate." Jackson

---

So. 3d at 762 (affirming lower court's ruling that online agreement's arbitration agreement was unenforceable where it was a *browsewrap agreement*, as opposed to a *clickwrap* agreement).

Decl. ¶¶ 17–19; Exs. D, E.  (entries from database reflecting that Shadow's Pub assented to the Agreement by clicking the activation portal's "I accept" button at 8:17 p.m. on August 4, 2017). *See Melver v. Check 'N Go of Fla., Inc.*, No. 13-20528-CIV, 2013 WL 12148376, at *2 (S.D. Fla. July 22, 2013) (rejecting plaintiff's argument that electronic signature on arbitration agreement was "not his," and holding that even the declaration "in which he avers that he does not recall signing the Dispute Resolution Agreement . . . fails to invalidate the agreement"); *see also Ferrara*, 2018 WL 573430 at *4 ("This Court likewise rejects [plaintiff's] generic denial that she signed the Dispute Resolution Agreement.  That Agreement is before the Court and it bears her electronic signature.").[7]

*Second*, the contract's terms included Ooma's Terms and Conditions, and in particular the arbitration provision, because those terms are incorporated by reference.  Specifically, Step Five of the activation portal *requires* prospective customers to check a box affirming that they "accept the Terms and Conditions," where the phrase "Terms and Conditions" appears in a bright blue font and hyperlinks to a full text of the Agreement.  Ex. A at 5; Jackson Decl. ¶¶ 8–9 (confirming that screenshots show the activation portal Shadow's Pub used to activate account).  "In Florida, 'where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing.'"  *Jones*, 2013 WL 6283483 at *5 (quoting *OBS Co., Inc. v. Pace Const. Corp.,* 558 So. 2d 404, 406 (Fla. 1990)); *see also Segal*, 763 F. Supp. 2d at 1368 (granting motion to transfer venue in action by an Amazon marketplace seller, based on clause in Amazon's clickwrap agreement, where "all prospective

---

[7]    *See Melver*, 2013 WL 12148376 at *2 (defendant offered "ample evidence demonstrating the authenticity of Plaintiff's consent" where arbitration agreement was part of a required "electronic onboarding" process for newly hired employees, the agreement was electronically signed, and the defendant's system kept a record of plaintiff's onboarding).

sellers [we]re required to navigate through a series of registration prompts and webpages . . . and agree to the terms and conditions for using the [service]").

*Third*, "there was sufficient consideration to support the [parties' agreement] because the agreement created a mutual obligation to arbitrate." *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So. 2d 658, 661 (Fla. Dist. Ct. App. 2008); *see* Ex. B at 29 ¶ 16 ("*[W]e each agree* to . . . arbitration . . . .") (emphasis added).  "In Florida, one party's promise to submit its claims to arbitration typically provides sufficient consideration to support the other party's promise to submit its claims to arbitration." *Tranchant v. Ritz Carlton Hotel Co., LLC*, No. 2:10-CV-233-FTM-29, 2011 WL 1230734, at *4 (M.D. Fla. Mar. 31, 2011).

### B.      The Parties' Agreement Requires Arbitration of Plaintiff's TCPA Claim

Beginning in August 2017, when her agreement with Ooma formed, Plaintiff agreed "to resolve any claim, dispute or controversy . . . arising out of or in connection with or relating to the [Agreement], or the breach or alleged breach thereof . . . by binding arbitration."  Ex. B at 29 ¶ 16. "'[A] claim has a nexus to a contract and arises from the terms of the contract if it emanates from inimitable duty created by the parties' unique contractual relationship.'" *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1225 (M.D. Fla. 2013) (quoting *Jackson v. Shakespeare Foundation*, 108 So. 3d 587, 593 (Fla. 2013)).

The parties' Agreement requires the arbitration of Plaintiff's TCPA claim because (i) Plaintiff's allegation is based on Ooma placing calls to her mobile telephone number, Compl. ¶ 17; (ii) Plaintiff, or her agent, provided that telephone number to Ooma when Plaintiff's Ooma Office account was activated and assented to the Agreement, Jackson Decl. ¶ 15; (iii) Ooma collects contact  information, in part, so that it can reach its customer in the event that there are issues related to billing the credit card customers are required to keep on file, Jackson Decl. ¶¶ 21–

22; (iv) there were, in fact, billing issues with this account, *id.* ¶¶ 20–27; and (v) the Agreement between the parties includes provisions requiring customers to keep credit card information up to date, Ex. B at 21 ¶ 11(b), keep contact and other account-related information up to date, *id.* at 3 ¶ 3(c), and pay their bills, *id.* at 3 ¶ 3(e).

Courts in this district have compelled arbitration of TCPA claims on similar facts, holding that attempts to contact a customer or debtor relating to an agreement have a sufficient nexus to be disputes arising out of the underlying agreement. *See Betancourt v. Green Tree Servicing, LLC*, No. 8:13-CV-2759-T-30AEP, 2013 WL 6644560, at *4 (M.D. Fla. Dec. 17, 2013) ("The Plaintiffs' [TCPA] allegations are tied directly to Shute's alleged failure to pay on the Note and Green Tree's authority to collect on the Note."); *Owings*, 978 F. Supp. 2d at 1225 ("Plaintiff's claims are directly tied to the collection of charges set forth in the Service Agreement. . . . Thus, Plaintiff's claims emanate from a duty created by the Service Agreement."). Here, the Court should not accede to Plaintiff's obvious attempt at skirting an arbitration agreement by filing a bare bones TCPA Complaint that completely fails to mention her preexisting relationship with the Defendant.

### C.     Plaintiff is Bound By the Terms of the Agreement to Arbitrate

Plaintiff cannot escape the terms of the arbitration agreement by maintaining that she is a non-signatory to the relevant agreement.  "'[T]raditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel[.]'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)); *accord Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, No. 8:13-CV-1408-T-TBM, 2014 WL 12650701, at *5 (M.D. Fla. Oct. 3, 2014)

("[L]ike the federal courts, Florida courts recognize exceptions that permit nonsignatories to enforce or be bound to arbitration agreements.").

### 1.    Plaintiff is Not Legally Distinct from Shadow's Pub

When the clickwrap agreement activation in the Ooma Office activation portal was completed, an enforceable agreement formed between Ooma, as a telephone service provider, and Shadow's Pub, as the telephone service customer.  At the same time, it is well settled that "[a] sole proprietorship and its owner are essentially one and the same."  *Lowery v. Hoffman*, 188 F.R.D. 651, 653 (M.D. Ala. 1999) (footnote omitted).  Thus, because Shadow's Pub has no independent legal existence, its owner—Sheryl Taylor, aka Sheryl Holly-Taylor, aka Sheryl Holly—is party to the arbitration agreement.  *See generally Masonoff v. State*, 546 So. 2d 72, 74 (Fla. Dist. Ct. App. 1989) ("The fact that a sole proprietorship has a separate address or telephone number does not, from our perspective, create an organization which is sufficiently separate from the sole proprietor to authorize a violation of [the RICO statute].").

### 2.    Plaintiff Directly Benefitted from the Agreement with Ooma

Additionally, or alternatively, Plaintiff directly benefitted from the agreement with Ooma, and, therefore, she is bound by its terms.  *See Kakawi Yachting, Inc.*, 2014 WL 12650701 at *5 ("'[A] nonsignatory . . . may be bound to arbitrate if the nonsignatory has received something more that an incidental or consequential benefit of the contract[.]'") (citation omitted).  Specifically, she (and Shadow's Pub) accepted the benefits of Ooma's VoIP telephone services, which Ooma only offers to business clients willing to agree prospectively to arbitrate any potential disputes.[8]  As the Plaintiff disclosed to Ooma during the activation process, Shadow's Pub had no other business

---

[8] Those terms have not changed since April 2016 and, still today, remain online for anyone to read at any time, at the following URL:  https://www.ooma.com/legal/terms/.  Jackson Decl. ¶¶ 9, 19.

telephone number (beyond what Ooma supplied with its service).  Ex. E ("NOLANDLINE").

Moreover, Plaintiff (and specifically her business) continued to reap the benefits of this Ooma

service well past when she stopped paying her bill.  Jackson Decl. ¶¶ 21, 25.  *See Owings*, 978 F.

Supp. 2d at 1224 (finding that the T-Mobile customer entered into an enforceable agreement to

arbitrate based on, *inter alia*, the customer's "subsequent use of T–Mobile services"); *see also*

*Kakawi Yachting, Inc.*, 2014 WL 12650701 at *9 ("Marlow Sales simply cannot deny that it

directly benefitted from the agreement containing the arbitration . . . provision[] [and] is estopped

from seeking to exploit the benefits of the agreement while also seeking to avoid the obligations

thereunder."); *id.* at 8 ("Beyond the direct benefit received by Marlow Sales, it is obvious that

Marlow Sales and Marlow Yachts, the builder, are closely aligned entities in the manufacture and

sale of this yacht and that the [*sic*] both sought the benefits of the Request for Classification.").

### 3.    Plaintiff's Agent Executed the Arbitration Agreement with Ooma

Additionally, or alternatively, Plaintiff is subject to the arbitration clause because her

agent—her husband, Chris Holly—executed the agreement electronically.  "[A party who] has not

signed an arbitration clause, may be compelled to arbitrate if a signatory executed the arbitration

agreement as its agent."  *Bd. of Trustees of City of Delray Beach Police & Firefighters Ret. Sys. v.*

*Citigroup Glob. Mkts*, Inc., 622 F.3d 1335, 1342 (11th Cir. 2010) ("*Delray Beach Ret. Sys.*").

Indeed, "an agent can bind a principal to an arbitration agreement just like any other contract," *Fi-*

*Evergreen Woods, LLC v. Estate of Robinson*, 172 So. 3d 493, 497 (Fla. Dist. Ct. App. 2015), and,

"[i]n Florida, '[i]t is well-established that an agent's authority may be inferred from acts, conduct

and other circumstances,'" *Delray Beach Ret. Sys.* 622 F.3d at 1343 (quoting *Bradley v. Waldrop*,

611 So.2d 31, 32 (Fla. Dist. Ct. App. 1992)).  "There is no special rule requiring the principal to

independently waive the right to a jury trial or expressly and separately acknowledge or agree that

the agent is also authorized to waive a jury trial on his or her behalf." *Fi-Evergreen Woods, LLC*, 172 So. 3d at 497.

Chris Holly routinely acts as the agent of his wife, the Plaintiff, who the state has licensed to run "Shadow's Pub," an unincorporated sole-proprietorship in Reddick, Florida. *See* Ex. H (alcoholic beverage license, listing Plaintiff personally); Ex. J (commercial lease, listing Plaintiff personally). Indeed, even on the small record accessible to Ooma at this stage, Plaintiff has allowed (or at least ratified) the following acts by Holly: (i) accepting legal process, on behalf of Sheryl Taylor, relating to the business, Ex. K at 1 (substitute service on "Chris Holly, husband"); (ii) participating in litigation, both with Plaintiff and on her behalf, Ex. L at 1 – 2 (joining "Motion to Determine Rent" relating to the Shadow's Pub facility in eviction proceeding); Kohlhofer Decl. ¶ 27 (describing Plaintiff's counsel's representation that he is taking instruction from Chris Holly in this lawsuit); (iii) communicating to third-parties using the "Shadows_Pub@yahoo.com" business email account, Exs. F (abusive email to Ooma in response to billing inquiry), M (email from Plaintiff's counsel directing Ooma's counsel to contact Mr. Holly regarding Plaintiff's lawsuit against Ooma); and (iv) arranging for business services, such as Ooma Office, Ex. B at 1 ("YOU REPRESENT TO US THAT YOU HAVE THE AUTHORITY TO ENTER THIS AGREEMENT"); *id.* at 2–3 ¶ 3(a) ("**Power and Authority**: You hereby represent and warrant that you . . . are authorized to change or modify your telephone service with your local telephone company."). *See Delray Beach Ret. Sys.*, 622 F.3d at 1343 ("Adams's authority to execute the account agreements also implied the authority to execute an arbitration clause that requires arbitration of disputes arising under those and all other agreements."); *Rushing v. Garrett*, 375 So. 2d 903, 906 (Fla. Dist. Ct. App. 1979) ("'Apparent authority . . . may arise when the principal knowingly permits the agent to act in a certain manner as if he were authorized.'") (citation

omitted); *see also Fi-Evergreen Woods, LLC*, 172 So. 3d at 497 ("Because dispute resolution documentation has become a regular part of medical facility admissions, . . . it was reasonable for the nursing home to take the patient's representation that her husband was authorized to review and sign all of the admissions-related documents, without limitation, as including the arbitration agreement.").

The same legal outcome holds if the Court instead analyzes this situation on ratification grounds—i.e., that Plaintiff, the principal, ratified the actions of her agent, Chris Holly.  Here, Plaintiff has already pleaded (and therefore conceded, for the purposes of this motion) that she had at least some contact with Ooma during the relevant period.  Compl. ¶ 6 (alleging that telephone calls from Ooma began in August 2017).  Significantly, however, Ooma has no record that anyone at Shadow's Pub, including the Plaintiff, ever contended that the calls were in error because there had never been an enforceable agreement; nor was Ooma instructed to deactivate its services.  Jackson Decl. ¶ 24.  Rather, Plaintiff continued to enjoy Ooma's services, *id.* ¶¶ 21, 25, and deferred to Mr. Holly to email Ooma from the "Shadows_Pub@yahoo.com" email account, with the following message:   "[Ooma] WILL NEVER GET PAID" and it should "GO FUCK [IT]SELF."  Ex. F.

Because she was aware that Ooma was providing services to Shadow's Pub, did not object to it, and continued to allow Holly to communicate and deal with Ooma on her behalf, Plaintiff ratified any unauthorized actions Chris Holly may have taken when activating the Shadow's Pub's Ooma Office account.  *See S. Fla. Coastal Elec., Inc. v. Treasures on Bay II Condo Ass'n*, 89 So. 3d 264, 267 (Fla. Dist. Ct. App. 2012) ("[A] principal who fails to repudiate or prevent a previously-authorized agent's continued representation can be held responsible for the agent's actions."); *see also Mungin v. Fla. E. Coast Ry. Co.*, 318 F. Supp. 720, 736 (M.D. Fla.

1970) (holding that a party's "silence worked ratification" where the party accepted benefit of an agreement and was present at subsequent hearing related to the issue, but "voiced absolutely no objection . . . nor . . . in any way attempt to call the attention of the Court to any protest that he might have"), *aff'd*, 441 F.2d 728 (5th Cir. 1971).[9]

## THE COURT SHOULD AWARD SANCTIONS

Plaintiff's frivolous filing squandered the time, energy, and financial resources of this Court, Ooma, and Ooma's counsel. "A primary aspect of [the Court's inherent] discretion [to sanction is] the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). Importantly, "[t]he [C]ourt's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses." *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015); *see also* Chambers, 501 U.S. at 50–51 (affirming imposition of sanctions against nonparty).

Moreover, Title 28, section 1927 of the United States Code authorizes federal courts to require those "who so multipl[y] the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Courts in this circuit have stated that "[t]he term 'vexatious' [in 28 U.S.C. § 1927] has been defined as a 'lawsuit instituted maliciously and without good cause.'" *Colomar v. Mercy Hospital*, NO. 05-22409-CIV, 2008 U.S. Dist. LEXIS 74938, at *20 n.12 (S.D. Fla. Sept. 26, 2008) (Seitz, J.) (quoting *Perry v. Orange County*, 341 F. Supp. 2d 1197,

---

[9]  Indeed, as recently as June 7, 2018, **Plaintiff has continued to allow Chris Holly to act on her behalf with regard to Ooma in this dispute**—using the "shadows_pub@yahoo.com" email account.  Kohlhofer Decl. ¶ 27; Ex. M.

1205–06 (M.D. Fla. 2004).  "Thus, the purpose of § 1927 is to deter frivolous litigation and abusive practices, as well as to ensure that those responsible bear the related costs." *Id.* (quoting *O 'Rear v. American Family Life Assurance Co.* of Columbus, Inc., 144 F.R.D. 410, 413 (M.D. Fla. 1992)).

To the extent this case should have been filed at all, it should have been filed in arbitration. However, Plaintiff, her counsel, and her husband, obfuscated the truth of Plaintiff's name, her history with Ooma, her telephone number, and other significant facts in an effort to avoid arbitration—all while seeking to enrich themselves by filing this frivolous lawsuit.  As a result of their conduct, Ooma has had to expend considerable time and money to (1) investigate the facts of the case to uncover the truth; (2) engage national counsel who is familiar with Ooma's inner workings as well as local counsel to represent it in this litigation; and (3) prepare and file the instant motion to compel the form of adjudication to which Plaintiff had already agreed.  Kohlhofer Decl. ¶¶ 4–28.  Ooma has incurred more than $50,000 in fees and costs to investigate and litigate this action, and will submit a detailed accounting of its requested fees and costs at the Court's request. *Id.* ¶ 29.[10]

## CONCLUSION

For the foregoing reasons, the Court should dismiss and compel arbitration.  In the alternative, the Court should stay the action and compel arbitration.  Regardless, the Court should also sanction Plaintiff and her agent for their evasive, frivolous, and vexatious conduct to date, which has come at significant unnecessary expense to Ooma.

---

[10]  Pursuant to Local Rule 3.01(g), counsel for Ooma states that it has conferred with Plaintiff's counsel on more than one occasion regarding this sanctions motion.  *See* Def. Ooma's Status Update and Unopposed Mot. for Ext. of Time, ECF No. 16 ¶¶ 4–7 (describing the same issue).  When this issue was last addressed, Plaintiff's counsel stated that he did not have the authority to consent to this motion, and indicated that he intended to withdraw.  But he has not done so.  Further, Plaintiff's counsel cannot delegate his right to a pre-motion conference under Local Rule to 3.01(g) to Chris Holly, Plaintiff's non-attorney husband, as the rule only extends to a "confer[ence] with *counsel for the opposing party*."  (Emphasis added.)  Thus, Ooma states that it has effectively complied with the rule's requirements, and Plaintiff's counsel has not given a response as to whether he consents.

Respectfully submitted this 27th day of June, 2018.

                          */s/Christina Sarchio*

Christina Sarchio (*pro hac vice*)
  *Trial Counsel of Record*
D. Brett Kohlhofer (*pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone:  (202) 261-3349
Facsimile:  (202) 261-3333
christina.sarchio@dechert.com
d.brett.kohlhofer@dechert.com

Mary Ruth Houston
Florida Bar No.: 834440
Email:  *mhouston@shutts.com*
Jaclyn S. Clark
Florida Bar No.: 117652
Email*:  jclark@shutts.com*
SHUTTS & BOWEN LLP
300 South Orange Ave., Suite 1600
Orlando, Florida 32801
Telephone: (407) 423-3200
Facsimile: (407) 425-8316

Marcela Lozano
Florida Bar No. 73882
SHUTTS & BOWEN LLP
E-mail:  MLozano@shutts.com
200 South Biscayne Blvd., Suite 4100
Miami, FL  33131
Telephone:  (305) 358-6300
Facsimile:  (305) 381-9982

*Attorneys for Defendant Ooma, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2018, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, including:

> Jon P. Dubbeld, Esq.
> Fla. Bar No. 105869
> Jon@berkmyer.com
> Berkowtiz & Myer
> 4900 Central Ave.
> St. Petersburg, Florida  33707
> (727) 344-0123 (office)
>
> *Attorneys for Plaintiff*

> _____*/s/ D. Brett Kohlhofer*_____
> D. Brett Kohlhofer (*pro hac vice*)
> DECHERT LLP
> 1900 K Street, NW
> Washington, D.C. 20006
> Telephone:  (202) 261-3349
> Facsimile:  (202) 261-3333
> d.brett.kohlhofer@dechert.com
>
> *Attorneys for Defendant Ooma, Inc.*